## WESTERN UNION TELEGRAPH Co. *v.* BALTIMORE & O. R. Co.

*(Circuit Court, D. Maryland.   May 26, 1884.)*

**1. CORPORATION — LICENSE TO MAINTAIN TELEGRAPH LINE — EXPIRATION OF CHARTER.**

A license was granted on June 18, 1853, by the Baltimore & Ohio Railroad Company to the Western Telegraph Company (a Maryland corporation) to maintain a telegraph line along the railway so long as the grantee existed as a telegraph company.   At the time of the grant the telegraph company held control of the Morse patents for 14 years from June 20, 1840, and its charter was for 30 years from February 4, 1847; that is to say, to expire February 4, 1877. *Held,* that the license lasted no longer than the corporation to which it was granted, and expired by its own limitation on the fourth of February, 1877.

**2. SAME — REINCORPORATION — NEW CORPORATION.**

The telegraph company, before the expiration of its charter under provisions contained in the general incorporation act of Maryland, passed in 1868, caused itself to be incorporated under that act as the "Western Telegraph Company of Baltimore City," to continue for 40 years.   *Held,* that the corporation thus formed was a new and different corporation, and not a continuation of the old one, and that the old corporation had gone out of existence and the license was at an end.

In Equity.

*Charles J. M. Gwinn* and *Wager Swayne,* for complainant.

*John K. Cowen* and *William F. Frick,* for defendant.

WAITE, Justice.   In the view I take of this case the only material facts are these:

The Western Telegraph Company was incorporated by the general assembly of Maryland on the fourth of February, 1847.   Laws 1846, c. 39.   Section 17 of the act of incorporation, is as follows: "And be it further enacted, that this act of incorporation shall inure for 30 years from its passage, and the legislature reserves to itself the right to alter or annul this act of incorporation at pleasure."   This company had the control of the use of the Morse patent for the electro-magnetic telegraph in the territory covered by its charter.   The patent extended for 14 years from June 20, 1840.   The Baltimore & Ohio Railroad Company, being desirous of having the free use of a line of telegraph between the *termini* of its road, on the eighteenth of June, 1853, entered into a contract with the Western Telegraph Company for that purpose.   In this contract the railroad company is denominated "the parties of the first part," and the telegraph company "the parties of the second part."   By article 1 the railroad company granted "to the said parties of the second part a license, as long as the said parties exist as a telegraph company, to erect and maintain a line of magnetic telegraph upon and within the limits of the said road, provided that the position of the posts or wires of the said telegraph company shall be such as shall be approved by the officers of the said railroad company."   Provision was made for the building of a substantial line of telegraph, to consist of two wires, if necessary, by the railroad company, which, when built, should become the property of the telegraph company.   After stating the plan agreed on for working the line, including the prompt transmission of all messages on the business of the railroad company free of charge, the contract proceeded as follows: "(9) In the event of a dissolution of the said telegraph company, or a suspension of operation on their part, either voluntary or in consequence of legal process of any kind, then the said railroad company shall be at liberty and are authorized to take charge of the said telegraph line for their own purposes, with the appurtenances, until the said telegraph company shall resume active opera-

tions; and it is expressly understood that no interest which the said telegraph company may have in said line shall be assignable so as to affect or impair, in any manner, the rights of the railroad company under these articles of agreement." Under this license and agreement the necessary posts and one line of wire were put up by the railroad company, from Ellicott's Mills, west. Afterwards, on the twelfth of September, 1855, a supplemental agreement was entered into between the parties, under which a line was put up from Ellicott's Mills to Camden Station, and a second wire put on from Camden Station to Cumberland. In 1859 the Western Telegraph Company leased the line to the American Telegraph Company, a New Jersey corporation, and in June, 1866, the American Telegraph Company assigned its lease to the Western Union Telegraph Company, a New York corporation. In 1871 or 1872 the Western Union Company put up a new wire on the line from Baltimore to Cumberland, at a cost of $9,664.60.

On the thirtieth of March, 1868, a general incorporation act was passed by the general assembly of Maryland, (Laws 1868, *c.* 471,) which provided, among other things, for the formation of companies "for constructing, owning, or operating telegraph lines in this state, where the principal office of said corporation is located in this state." Section 24, class 11. By section 75 any existing corporation of the state, formed for any of the purposes mentioned in the act, might "cause itself to be incorporated under this article," [act,] provided, on due notice to the stockholders, two-thirds of all the shares should be voted in favor of the measure.

"Sec. 75. And be it further enacted, that if, at such meeting, or any adjourned meeting of said stockholders, a sufficient number of votes, as aforesaid, shall be given in favor of causing said corporation to be incorporated under this article, then the said meeting * * * shall determine the number of shares into which the capital stock of the new company shall be divided, and the rule of the apportionment thereof, and the person who shall be entitled to hold the same, and also the name by which said new corporation shall be known, and a certificate shall be made out and signed by the president of said meeting, showing the compliance by said corporation * * * with the requirements of this article in that behalf, and the said certificate shall also show the proposed name of the new corporation, which shall always include the name of the county or city in which it may be formed, the former name of said corporation, the object and purpose for which the new corporation is sought, the terms of **its** existence, not to exceed forty years, and the articles, conditions, and provisions under which the incorporation is formed, the place or places of business where the operations of the corporation are to be carried on, and the place in the state in which the principal office of the corporation will be located, the amount of the capital stock of the corporation, the number of shares, and the amount of each share, and the number of trustees, directors, or managers who shall manage the concerns of the corporation for the first year.

"Sec. 76. And be it further enacted, that the said certificate shall be signed and sworn to or affirmed by the chairman of said meeting, and shall also be signed by the president of the said corporation, and attested by its seal, and shall be thereupon submitted to judicial inspection; * * * and thereupon the said corporation shall be a body corporate, in fact and in law, under the name set forth in the said certificate, and shall be subject to all the provisions, and entitled to all the powers and privileges, conferred by this article, so far as the same are applicable to the said corporation; and the former charter of said corporation shall be deemed to be thereupon surrendered, and all the property and assets belonging to the said former corporation, of whatsoever nature and description, and all the debts and liabilities of said former corporation, of whatsoever nature or description, shall * * * be devolved upon the said new corporation, which shall, for this purpose, be regarded as sub-

stituted by operation of law in the room and stead of the former corporation, and all pending proceedings at law or in equity, on behalf of or against said former corporation, may be amended at the instance of either party, so that the new corporation shall be substituted as complainant, plaintiff, or defendant, as the case may require, in lieu and in place of the old corporation."

The charter of the Western Telegraph Company expired on the fourth of February, 1877, but on the eighth of January, 1877, the company, availing itself of the privileges of sections 74, 75, and 76 of the act of 1868, c. 471, formed a new corporation under the name of the "Western Telegraph Company of Baltimore City," to continue for 40 years. At the expiration of the term of the original charter, the Baltimore & Ohio Railroad Company notified all the several telegraph companies that the licenses granted by the contract of 1853, and the supplementary contract of 1855, were at an end, and that if there were any wires or instruments on the line belonging to either of the telegraph companies they would be given up at once on application to the railroad company. This bill was filed by the Western Union Company to enjoin the railroad company from preventing its operation of the line, and from permitting any other company to use it.

The court of appeals of Maryland, at the October term, 1876, decided in *Sprigg* v. *Western Telegraph Co.* 46 Md. 67, that the stockholders of the Western Telegraph Company had the legal right to form a new corporation under the act of 1868, c. 471, and that for this purpose the requisite majority could bind the minority. But whether the corporation thus formed would be a new one, or simply a continuation of the old one, was not decided. The facts did not present that question, for the suit was begun by the holder of but two shares of the stock of the old corporation to enjoin the company and the majority stockholders, who were made defendants, from reorganizing under the act. The holding was that there was nothing in the original act of incorporation "to prevent a majority of the stockholders from organizing under the act of 1868," and "that the proposed organization * * * is not liable to the objection that it will effect a radical and fundamental change in the objects and purposes for which the original company was chartered."

The question which meets us at the outset is whether the license granted to the Western Telegraph Company by the agreement of 1853 is still in force? The license was to continue "so long as the said parties of the second part exist as a telegraph company." The "parties of the second part" were the Western Telegraph Company. That company was, by its charter, limited in its existence to 30 years from February 4, 1847, or to February 4, 1877. If the rights of the parties rested on this charter alone, no one would contend that either the company or its stockholders were entitled to use the railroad as a way for a telegraph line after the date of the expiration of the charter. This makes it necessary to inquire whether the formation of the "Western Telegraph Company of Baltimore City," under the act of 1868, operated in law as a prolongation of the existence of the Western Telegraph Company so as to avoid the termination of the license. The language of the act of 1868 is that "any corporation heretofore formed * * * may cause itself to be incorporated under this ar

ticle." And if the necessary vote at the meeting of the stockholders "is given in favor of causing said corporation to be incorporated under this article," the meeting must "determine the number of shares into which the stock of the new company shall be divided, and the rule of apportionment thereof, and the persons who shall be entitled to hold the same, and also the name by which said new corporation shall be known." After this is done, a certificate must be made out showing "the proposed name of the new corporation, which shall always include the name of the county or city in which it may be formed, the former name of said corporation, the objects or purposes for which the new corporation is sought, the term of its existence, not to exceed forty years, and the articles, conditions, and provisions under which the incorporation is formed, the place or places of business where the operations of the corporation are to be carried on, and the place in this state in which the principal office of the corporation will be located, the amount of the capital stock of the corporation, the number of shares, and the amount of each share, and the number of trustees, directors, or managers who shall manage the concerns of the corporation for the first year." When this certificate shall be judicially determined to be "in conformity with law," and properly recorded, "the said corporation shall be a body corporate in fact and in law, under the name set forth in the said certificate, and shall be subject to all the provisions, and entitled to all the powers and privileges, conferred by this article, so far as the same are applicable to the said corporation, and the former charter shall be deemed to be thereupon surrendered, and all the property and assets of the former corporation, * * * and all the debts and liabilities, * * * shall * * * be devolved upon the said new corporation, which shall, for this purpose, be regarded as substituted by operation of law in the room and stead of said former corporation. * * *"

From this it seems to me clear that the "Western Telegraph Company of Baltimore City," formed under the act of 1868, is, in fact and in law, a different corporation from the "Western Telegraph Company" incorporated in 1847. The corporation under the act of 1868 was, by operation of law, invested with all the property and subjected to all the liabilities of that of 1847, but as corporations they were separate and distinct things. That under the act of 1868 had the same stockholders, at first, as that of 1847; but it had a new name and new powers, and was subject to new obligations. The general objects and purposes of the two corporations were the same, but their corporate existences different. The act of 1868 does not provide for the continuing of old corporations, but for the creation of new ones; not for amending charters, but for surrendering them. The old corporation is to go out of existence, when the new one comes in, and thus the new cannot be a prolongation of the old.

Such being the case, I am of the opinion that the license of 1853 expired, by its own limitation, on the fourth of February, 1877, if not

on the eighth of January previous, when the charter of the Western Telegraph Company was surrendered and that to the Western Telegraph Company of Baltimore City obtained. The grant was for so long a time as the Western Telegraph Company existed as a telegraph company; that is to say, so long as the Western Telegraph Company existed as a telegraph corporation. The license lasts no longer than the corporation to which it was granted. The ninth clause of the contract does not affect this question, because the Western Telegraph Company has never resumed operations. It was dissolved on the eighth of January, or, at the latest, on the fourth of February, 1877. After that time the Western Union Telegraph Company, as lessee of the line, stands in no better situation than its lessor, the Western Telegraph Company.

I have not referred to the peculiar description of the Baltimore & Ohio Company in the contract, as *parties* of the first part, and the Western Telegraph Company, as *parties* of the second part, because to my mind it has no significance. The railroad company contracted with the telegraph company, and there is nothing whatever in the agreement to indicate that they, or either of them, represented or intended to represent their stockholders in any other way than in their corporate capacities. This peculiarity in the language of the contract is due to the form of expression adopted by the draughtsman, rather than to any matter of substance affecting the agreement.

This disposes of the case, so far as the further use of the line by the Western Union Company is concerned. The license from the Baltimore & Ohio Company having expired, the telegraph company has no longer a right to use the railroad for the operation of its telegraph line. Its rights in that particular expired with those of the Western Telegraph Company, and, as the license to the Western Telegraph Company was only to continue so long as that company existed, it did not pass, as property of that company, to the Western Telegraph Company of Baltimore City, upon its formation.

The only remaining questions are in reference to the rights of property in the material composing the physical structures of the line. The Western Union Company, as lessee, does not own any of this material, unless it may the wire put up in 1872. It acquired from the Western Telegraph Company a right to use the line as built so long as that company could use it. When its right to use the line was gone, all its interest in the physical structure was gone, except so far as it may have itself built the line or furnished the material. So far as the posts and the two wires put up by the railroad company are concerned, the Western Telegraph Company of Baltimore City can alone make claim to them. Such property rights as the Western Telegraph Company had in them passed to the new company on its organization under the operation of the act of 1868. As to the wire put up by the Western Union Company, the facts are not sufficiently devel-

oped, either by the pleadings or the evidence, to enable me to determine satisfactorily what the rights of the parties are.

In my opinion, therefore, the bill should be dismissed, but without prejudice to a further action for the recovery of the wire put up by the Western Union Company.

BOND, J., concurred.